**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

_____

STEVE D'EREDITA,

                              Plaintiff,                    DECISION AND ORDER

                    -vs-                                    07-CV-6185-CJS

ITT INDUSTRIES AND ITT GOULDS PUMPS,

                              Defendants.

_____

**APPEARANCES**

For Plaintiff:                          Christina A. Agola, Esq.
                                        2100 First Federal Plaza
                                        28 East Main Street
                                        Rochester, NY 14614
                                        Tel. (585) 262-3320

For Defendants:                         Joseph S. Brown, Esq.
                                        Hodgson Russ, LLP
                                        The Guaranty Building
                                        140 Pearl Street Suite 100
                                        Buffalo, NY 14202
                                        Tel. (716) 848-1346

**INTRODUCTION**

**Siragusa, J.** This employment discrimination case is before the Court on Defendants ITT Industries' and ITT Goulds Pumps' ("ITT")[1] motion for summary judgment seeking dismissal of the complaint. For the reasons stated below, the motion is granted.

_____

[1]Although Plaintiff sues two named entities, he refers to them throughout his complaint in the singular.

**BACKGROUND**

Plaintiff Steve D'Eredita ("D'Eredita") commenced this lawsuit by filing a complaint with this Court on April 5, 2007, in which he raised three causes of action as follows:

(1) discrimination after engaging in a protected activity (giving ITT notice he was suffering from dyslexia and could not work alone on his assembly line) in violation of Title VII of the Civil Rights Act of 1964;

(2) discrimination by wrongful retaliation after making a good faith complaint of discrimination in violation of New York State Executive Law section 290; and

(3) discrimination by a pattern of illegal retaliation in violation of New York State Human Rights Law, Executive Law section 290 *et seq.* by failing to take any remedial action in light of his good faith complaint of discrimination.

However, in her memorandum of law in opposition to the motion for summary judgment, Plaintiff's counsel, Christina Agola, Esq., states the following:

> This is an action brought pursuant to the Americans with Disabilities Act for discrimination in that defendant failed to accommodate Plaintiff and engage in the interactive process and for retaliation.

(Pl.'s Mem. of Law, at 1.) This position was reiterated by Ms. Agola's associate, Jason Little, Esq., who appeared for Plaintiff at oral argument. Despite the confusing way in which the complaint was drafted, ITT interpreted the lawsuit to involve a claim under the Americans with Disabilities Act and, accordingly, the Court will do the same.

The parties agree on the following facts for the purposes of this motion. ITT manufactures residential and commercial water supply and wastewater centrifugal and turbine pumps, controllers, variable frequency drives and accessories, in production

facilities located in Seneca Falls and Auburn, New York. Each of the plants is covered under separate labor agreements with the same union, Local 3298 of the United Steelworkers. D'Eredita started working for Goulds Pumps, Inc. ("Goulds"), in 1987 at the Seneca Falls plant. When ITT acquired Goulds in 1997, it also inherited the labor agreements. The agreements allowed limited rights to "bump" and bid between facilities and, on or about February 18, 2002, D'Eredita was bumped from the Seneca Falls facility to the Auburn facility by a person with greater contractual seniority. Those "bumping" rights were eliminated on August 2, 2003, per the labor agreement.

From February 18, 2002, until February 20, 2004, D'Eredita held the title of Commercial Assembler (Level 6) at the Commercial Factory in Auburn ("Commercial Factory"). With respect to that position, ITT developed, with union approval, a job description (which D'Eredita points out was the same or virtually identical to the description for all the jobs D'Eredita held), providing that a Commercial Assembler must:

> Assemble all variations of the Water Systems Commercial-line pump. Make special mounting arrangements and follow standard assembly procedures, to include: cleaning, scraping, fitting and performance testing of all pumps assembled. Read and interpret formal orders and bills of material. Responsible for proper ID of all material. Verify parts vs. specifications. Work from assembly instructions. Use hand and power tools. Repair production line pumps and perform miscellaneous duties as required.

(D. Brown Decl., Ex. A.) Part of the assembly process involves entering bar code numbers into a computer. Douglas H. Brown ("Brown"), the Team Leader for ITT's Commercial Factory since 1996, stated in his declaration that,

> a Commercial Assembler must be able to quickly read and process a wide variety of written materials in order to perform the essential functions of

the job at all positions on the assembly line. It is my expectation that all Commercial Assemblers be trained on all aspects of the assembly process to ensure that the Company can meet changing customer demands.

(D. Brown Delc. ¶ 12.) D'Eredita, in his letter of April 26, 2005, to John E. Thompson, Investigator with the U.S. Equal Employment Opportunity Commission, stated that, "I was having difficulties immediately. I should have been job failed. I was told on the 3rd day on the job to pick up the pace and that I was too slow." (Pl.'s Appendix to Local Rule 56.1 Statement of Facts Not in Dispute, Ex. F, at 1.) D'Eredita repeated the same information at his pre-trial deposition when he said, "The next day, bang. You've got to get moving. You're not fast enough." (D'Eredita Dep., at 140.) Nevertheless, D'Eredita disputes that one of the job requirements was speed. (*See* Pl.'s Response to Def.s' Statement of Material Facts ¶ 12.)

The Auburn factory has seven assembly lines, each with focus on a specific product. Lines one through four manufacture small end-suction pumps. Lines five and six manufacture large end-suction pumps. Line seven manufactures stainless steel vertical pumps. The number of assemblers on a line varies with customer needs and product specifications, but line two generally had only one assembler, and the other lines from one to three assemblers. On line seven, which has three assemblers for example, the first assembler reviews the customer's work order containing information concerning the model, quantity, and due date requested by the customer. He then reviews the Bill of Material to determine what parts are necessary to build the pump ordered. This requires the first assembler to identify the parts necessary to commence the manufacturing process. The second assembler on line seven completes assembly of the pump, and must also refer to the work order and Bill of Material to ensure the

pump is being built according to specifications. The second assembler administers various tests to ensure the pump operates according to specifications. The third assembler on line seven then reviews the Bill of Material to determine if the pump requires a motor. If it does, he locates the correct motor number and installs it. The third assembler then completes the process by packing the pump, which again involves reviewing the Bill of Material to determine how to pack it according to specifications. Finally, the third assembler reviews various numbers to ensure that the model number, bar code, and date are correctly entered in order to generate various labels that are placed on the pump and package.

Lines two and three produced the same "family" of pumps with the difference being that line three was equipped to handle a much higher volume. (D. Brown Decl. ¶ 19.) The sales records for 2003 and 2004 show that 65% of the workload for this family of pumps occurred on line three, whereas approximately 35% of the workload was handled on line two. Consequently, line three was staffed with two assemblers and line two typically needed only one. A second assembler was sent to line two on shifts where it could be justified by customer demands.

ITT strove to train all Commercial Factory assemblers on all aspects of the assembly process so they could be easily moved to any position on any line, thereby permitting ITT to efficiently respond to customer requirements. The Commercial Factory has a number of long-standing "Shop Behavior Rules" established to provide reason-able guidelines for employees. One prohibition in the workplace is "neglect of or inattention to duties" as written in Shop Rule No. 6. D'Eredita committed a number of errors, which ITT alleges violated this rule. Some of D'Eredita's violations merely

resulted in counseling, while others resulted in discipline. D'Eredita's errors are summarized in a chart included in Brown's reply declaration ¶ 13. Although D'Eredita disputes whether he was at fault for the errors that occurred while he worked as the third assembler on line seven, ITT moved him to line two, where he worked alone. While on line two, D'Eredita continued to make errors, which ITT alleges violated Rule 6. On July 24, 2003, D'Eredita asked for help and complained that he was the only person working alone, and stated his supervisor would tell him every day that he was too slow. (D'Eredita Dep., at 92.) However, after several of these errors, which D'Eredita disputes and claims were not his fault, ITT formerly disciplined him, and on August 5, 2003, suspended him for two days. After a hearing on August 6, 2003, D'Eredita was reinstated effective the following day. The union did not grieve the suspension. At about the time of the August 6 hearing, D'Eredita believes that he mentioned to his supervisor that he was "crossing [his] letters and numbers, especially [his] numbers." (D'Eredita Dep., at 104.) He concluded that if he had help, "this wouldn't be happening, but I don't know why it's happening." (*Id.*, at 105.)

On November 6, 2003, Brown met with D'Eredita and others after discovering that D'Eredita had assembled ten pumps on July 17, 2003, using the wrong motor. Brown then warned D'Eredita that he would elevate the discipline to discharge if he received one more complaint from August 5, 2003, forward, and encouraged D'Eredita to consider some other area of work at ITT, since it appeared to Brown that D'Eredita was not well suited for assembly work at the Commercial Factory. On November 14, 2003, Brown discovered yet another error D'Eredita had made while he was working on line two. ITT had received two pumps from a customer, each with the wrong motors.

The Bill of Material indicated that the pumps were to include Motor No. E07876; however, D'Eredita incorrectly used Motor No. E07878. Brown's investigation revealed that the pumps had been built on August 8, 2003, the day after D'Eredita had been reinstated from his two-day suspension for defective work. Brown, D'Eredita and the union representative met on November 14, 2003 to discuss the situation, and Brown informed D'Eredita that he would decide the following Monday what course of action to take. As he had on previous occasions, D'Eredita told Brown that he needed more help on his line.

On November 21, 2003, ITT held a suspension hearing with D'Eredita, his supervisor, a union representative and employees from human resources. At the hearing, D'Eredita produced, for the first time some, evidence that he might have a disability. He provided a letter from Mark S. Ryan, M.D., dated November 20, 2003, indicating that D'Eredita "probably has mild dyslexia" and recommending further testing to confirm the diagnosis. Dr. Ryan also stated in his letter that he did not consider D'Eredita to be disabled and recommended that D'Eredita be considered for transfer to "another position at Goulds [sic]." (J. Brown Decl., Ex. H.) ITT points out that at no time prior to November 20, 2003, did D'Eredita ever suggest that he suffered from dyslexia.

At the November 21 hearing, D'Eredita said that he thought he was doing the job right, "but I was just racing." (*Id*., at 106.) D'Eredita also recalled that sometime after August 6, 2003, there was another time when he was suspended, and he remembered telling Brown, "I don't know how many times you heard it from me. I need help on my line." (*Id*., at 110-11.)

At the November 21st hearing, supervisory personnel at ITT decided that D'Eredita should be encouraged to bid for other jobs at the Commercial Factory. D'Eredita points out that during this hearing, ITT's Director of Human Resources, Dawn DeRue ("DeRue"), commented that although she was aware of the requirements of the Americans with Disabilities Act, she did not believe there was anything further the company could do for D'Eredita, since he had to perform the essential functions of his job as an average man. (Suspension Hearing for Steve D'Eredita, Small Conference Room, Friday, November 21, 2003, attached as Exhibit HH to Volume II of Pl.'s Appendix to his Local 56.1 Statement of Material Facts, at 1-2.) Present at the hearing was Jerry Watkins, a union representative, who asked whether there were any jobs D'Eredita could bid on that were either at a slower pace, or required working on a large lot of the same part numbers. In that regard, D'Eredita had said that the less he had to look at, the less chance there was for errors and also that the pace was slower at Seneca Falls and, consequently, he had time to comprehend what was going on. DeRue reviewed D'Eredita's personnel file and added that despite D'Eredita's claim that he did not have problems at Seneca Falls since the pace was slower, that was not correct. She pointed out that there was in fact a similar situation at Seneca Falls when D'Eredita worked for Bob Cordovani in Bedplating and Shipping in 2001, and he bed-plated the wrong serial number on a pump. (DeRue Decl. ¶ 19.) D'Eredita countered that he was bedplating and "these were special orders that were produced at a constant pace. That's why I had a problem." (Ex. HH, at 2.) At the conclusion of the hearing, D'Eredita was suspended and allowed to return to work on November 25, 2003. The union did not grieve the suspension.

On February 12, 2004, Brown learned from a quality assurance technician that a pump built by D'Eredita on February 5, 2004, leaked while the technician was conducting a random out-of-box audit. D'Eredita contended that the box had been damaged. The pump was tested on February 12, 2004, and "water poured out of the weep hole—very apparent that it leaked." (D. Brown Decl. ¶ 45.) D'Eredita disassembled the pump and all observed a gap between the seal faces, which had caused the leak. The parts were inspected and none were found to be defective. D'Eredita then reassembled the pump with the same parts with the seal faces now to-gether, the pump was tested and did not leak. Nonetheless, D'Eredita disclaimed blame and  stated his opinion that the seals could "relax" while in storage and, therefore, cause a leak. To test this theory, Brown kept the pump in ITT's Returned Material Operations area and, one week later, had D'Eredita retest the pump. After a week of storage to allow the seals to "relax," D'Eredita tested the pump and it did not leak. Brown concluded that D'Eredita had improperly installed the mechanical seal when he built the pump. Consequently, Brown prepared a memorandum stating that D'Eredita would be suspended with intent to discharge.

ITT held another suspension hearing on February 20, 2004. During the hearing, D'Eredita stated that he had successfully bid on a job on a paint line in another factory at the Auburn facility, but had withdrawn his bid when he was told by Doug Hay that he would be doing assembly and packing instead of working on the paint line. (DeRue Decl. ¶ 24.) D'Eredita conceded, however, that he had no knowledge concerning what an assembly job on the line in that factory may have been like, what kind of pumps were made, how fast was the pace in that factory, whether he would have help, or on

what line he would have been placed. Nor, did he make any attempt to speak with the person who might have been his supervisor at the new factory. Following the hearing, ITT and the union signed an agreement which provided as follows:

> 1. Steve D'Eredita is on layoff effective immediately.
>
> 2. While on layoff Steve D'Eredita must be the successful bidder on a non-production and non-shipping position within one (1) year. If at the end of this one-year layoff, Steve has not been awarded such a position, his employment will be terminated.

(DeRue Decl., Ex. G.)

Pursuant to this agreement, D'Eredita successfully bid on a job as a Machine Tool Set Up/Dispatcher and resumed his employment at ITT on February 28, 2005. During the time he was laid off, ITT allowed D'Eredita to continue his medical benefits. He paid the employee contribution, while ITT paid the balance of the medical premium. Under the labor agreement, his coverage would have lapsed in March 2004.

In January 2004, D'Eredita filed a complaint using ITT's internal ombudsman process. His complaint was investigated by George F. Corliss ("Corliss"), the Senior Director, Labor and Employment Law for ITT. In February 2004, Corliss traveled to Auburn to meet with D'Eredita and conducted an investigation. Although D'Eredita had already been laid off and given the option to bid on another job, Corliss expressed to him that ITT wanted to determine if it could reasonably accommodate D'Eredita's condition. ITT offered D'Eredita the ability to have additional testing by a clinical psychologist and made arrangements for him to see Peter B. Sorman, Ph.D., at ITT's expense. From February to June 2004, Corliss communicated with D'Eredita and interviewed other employees at ITT to gather relevant information concerning

D'Eredita's ombudsman complaint. After D'Eredita saw Dr. Sorman in April, he did not provide ITT with a copy of Dr. Sorman's evaluation until discovery in this litigation. On June 25, 2004, Dr. Ryan wrote a summary of Dr. Sorman's findings in a letter addressed to D'Eredita. (Mark S. Ryan, M.D., letter to Stephen D'Eredita (Jun. 25, 2004), attached as Ex. RR to Pl.'s Appendix to his Local Rule 56.1 Statement of Facts.) On July 20, 2004, since he had still not received Dr. Sorman's recommendations, Corliss wrote to D'Eredita to say he was closing his file on the complaint.

On October 20, 2004, the parties attended a mediation session conducted by the Equal Employment Opportunity Commission. At the mediation, D'Eredita produced a copy of Dr. Ryan's letter of June 25 summarizing the evaluation conducted by Dr. Sorman. Although D'Eredita claims he had previously relayed information about Dr. Sorman's evaluation to Corliss over the phone, this was the first time anyone from ITT had seen written documentation concerning Dr. Sorman's evaluation. As later revealed in Dr. Sorman's report (during discovery), but not included in Dr. Ryan's summary, Dr. Sorman determined that D'Eredita's reading recognition was at an eighth-grade equivalent and his reading comprehension was limited to a grade 4.1 level. Dr. Sorman had diagnosed D'Eredita with audio and visual dyslexia and indicated an average performance for "verbal abstract reasoning, immediate auditory sequential memory for digits, letter-number sequencing and visiospatial synthesis of complex designs." (Neuropsychological Evaluation—Comprehensive, attached as Ex. QQ to Vol. II of Pl.'s Local 56.1 Counter Statement of Material Facts.) Dr. Sorman's recommendations were:

> 1. Restructuring of Mr. D'Eredita's job requirements to hands-on work is suggested. Based on current data, Mr. D'Eredita cannot accurately put numbers in a sequence on the computer unless he is given a much

slower work pace and the numbers are checked. It may be more appropriate to assign this task to someone else to have Mr. D'Eredita work on the line.

2. Mr. D'Eredita would probably benefit from books on tape.

3. Reading remediation is suggested at a center that specializes in this work, such as that offered at Nazareth College or RIT.

4. Mr. D'Eredita may wish to be referred to VESID for potential job coach support if desired.

(*Id.*, at 3-4.)

## STANDARDS OF LAW

### *Summary Judgment*

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "[T]he movant must make a *prima facie* showing that the standard for obtaining summary judgment has been satisfied." 11 Moore's Federal Practice, § 56.11[1][a] (Matthew Bender 3d ed.). That is, the burden is on the moving party to demonstrate that the evidence creates no genuine issue of material fact. *See Amaker v. Foley,* 274 F.3d 677 (2d Cir. 2001); *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893 (3d Cir.1987) (*en banc*). Where the nonmoving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible

evidence, would be insufficient to carry the nonmovant's burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

Once that burden has been met, the burden then shifts to the nonmoving party to demonstrate that, as to a material fact, a genuine issue exists. Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A fact is "material" only if the fact has some affect on the outcome of the suit. *Catanzaro v. Weiden*, 140 F.3d 91, 93 (2d Cir. 1998). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether a genuine issue exists as to a material fact, the court must view underlying facts contained in affidavits, attached exhibits, and depositions in the light most favorable to the nonmoving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Moreover, the court must draw all reasonable inferences and resolve all ambiguities in favor of the nonmoving party. *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993); *Anderson*, 477 U.S. at 248-49; *Doe v. Dep't of Pub. Safety ex rel. Lee*, 271 F.3d 38, 47 (2d Cir. 2001), *rev'd on other grounds Connecticut Dept. of Public Safety v. Doe*, 538 U.S. 1, 123 S.Ct. 1160 (2003); *International Raw Materials, Ltd. v. Stauffer Chemical Co.*, 898 F.2d 946 (3d Cir. 1990). However, a summary judgment motion will not be defeated on the basis of conjecture or surmise or merely upon a "metaphysical doubt" concerning the facts. *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)); *Knight v. United States Fire Ins. Co.*, 804 F.2d 9 (2d Cir. 1986). Rather, evidentiary proof in admissible form is required. Fed. R. Civ. P. 56(e). Furthermore, the party opposing summary judgment "may not create an issue of fact by submitting an

affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Hayes v. New York City, Department of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996).

Of course, it is well settled that courts must be "particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question. Because direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997) (citations and internal quotations omitted). However, the general rule holds and a plaintiff may not defeat a motion for summary judgment merely by relying upon "purely conclusory allegations of discrimination, absent any concrete particulars which, if believed, would show discrimination." *Id*.; *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985).

**Americans with Disabilities Act**

To establish a claim under the Americans with Disabilities Act ("ADA"), a plaintiff must prove (1) the employer is subject to the ADA; (2) the plaintiff is disabled within the meaning of the ADA; (3) the plaintiff could perform the essential functions of his job with or without reasonable accommodation; and (4) the plaintiff suffered an adverse employment action because of his disability. *Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 869-70 (2d Cir. 1998). With regard to being able performing the essential functions of a job, the Second Circuit wrote in *D'Amico v. City of New York*, 132 F.3d 145 (2d Cir. 1998) that,

The Supreme Court defines an individual as "otherwise qualified" if he "is able to meet all of a [position's] requirements in spite of his handicap." *School Bd. of Nassau County v. Arline*, 480 U.S. 273, 287 n. 17 (1987) (internal quotation marks omitted).

The determination of whether the employee is otherwise qualified as of the date of termination is based on a prospective comparison of the employee's ability to perform and the abilities of non-disabled individuals to perform....To evaluate whether an employee with a disability is otherwise qualified, there are a number of factors to consider. But, the inquiry essentially boils down to examining what conduct is symptomatic of the handicap, what conduct the job in question requires, and how these two interact. A court must give considerable deference to an employer's judgment regarding what functions are essential for service in a particular position.

*D'Amico*, 132 F.3d at 151 (citations omitted).

### New York Human Rights Law

Plaintiff also makes a claim under the New York State Human Rights Law, codified at New York Executive Law § 296. That statute makes it an unlawful discriminatory practice

for an employer or licensing agency, because of the age, race, creed, color, national origin, sex, disability, genetic predisposition or carrier status, or marital status of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

N.Y. Exec. Law section 296(1)(a) (1996). The Court notes that the elements of Title VII and New York Discrimination Law claims "can be analyzed, for purposes of determining sufficiency of the evidence, in a manner virtually identical to those under Title VII." *Gallagher v. Delaney*, 139 F.3d 338, 345 (2d Cir. 1998).

***McDonnell Douglas Standard***

In reviewing a motion for summary judgment based upon disability discrimination, the Court applies the burden-shifting rules set forth in *McDonnell Douglas v. Green*, 411 US. 792 (1973). Plaintiff has the initial minimal burden of making out a *prima facie* case. *See Fisher v. Vassar College*, 114 F.3d 1332, 1335 (2d Cir. 1997).

> If a plaintiff establishes a prima facie case, a presumption of discrimination is created and the burden of production shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the adverse employment action or termination. *See McDonnell Douglas*, 411 U.S. at 802-03; *James* [*v. New York Racing Ass'n*], 233 F.3d [149] at 154; *Quaratino*, 71 F.3d at 64. The defendant is not required to prove that the articulated reason actually motivated its actions. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981) ("The defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff."). "If the defendant fails to discharge the burden by presenting a nondiscriminatory reason, the plaintiff will prevail (assuming the other aspects of the prima facie case are not contested)." *James*, 233 F.3d at 154....

*Farias v. Instructional Sys.*, 259 F.3d 91, 98 (2d Cir. 2001).

> "'The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated ...remains at all times with the plaintiff.'" *St. Mary's* [*Honor Ctr. v. Hicks*], 509 U.S. [502] at 507 [1993] (quoting *Burdine*, 450 U.S. at 253). Thus, once the employer has proffered its nondiscriminatory reason, the employer will be entitled to summary judgment (or to the overturning of a plaintiff's verdict) unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination. *See St. Mary's*, 509 U.S. at 510-11; *Burdine*, 450 U.S. at 255-56; *Fisher*, 114 F.3d at 1336. In sum, our holding in *Fisher* was that once the employer has proffered a reason for its action, all presumptions and special rules drop away; a case under Title VII becomes like any other case in that the plaintiff, in order to prevail, must have evidence from which the factfinder can reasonably find the essential elements of the claim.

*James v. New York Racing Ass'n.*, 233 F.3d 149, 154 (2d Cir. 2000).

*Retaliation*

With respect to retaliation, the Court must also analyze such claim under the familiar three-part burden shifting analysis first set forth in *McDonnell-Douglas*. In order to make out a prima facie case of retaliation, a plaintiff must show by a preponderance of the evidence: (1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action. *Tomka*, 66 F.3d at 1308. Moreover, "the burden that must be met by an employment discrimination plaintiff to survive a summary judgment motion 'at the prima facie stage is de minimis'." *Id.* (quoting *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994)) (other citations omitted).

## ANALYSIS

*ADA Claim*

ITT argues that what they have interpreted to be D'Eredita's reasonable accommodation claim should be dismissed because: he could not perform the essential functions of his job with, or without, a reasonable accommodation; the accommodations he requested would not have permitted him to perform the essential functions of his job as a Commercial Assembler; the accommodations he requested were not reasonable; and in any event, ITT accommodated D'Eredita's disability by paying for additional testing and allowing him to bid on non-production jobs, one of which he eventually accepted. Further, ITT contends that D'Eredita cannot rebut ITT's nondiscriminatory basis, the errors he committed, for taking disciplinary action against him and placing him on layoff status.

D'Eredita counters that he could perform the essential functions of his job with a reasonable accommodation;[2] that a reasonable accommodation would have permitted him to perform the essential functions of his job; that his requested accommodations [sic][3] were reasonable; that ITT did not accommodate him; and that ITT's reasons for placing him on layoff were pretextual.

## A

First ITT maintains that D'Eredita could not perform the essential functions of the job at issue in this litigation either with, or without, a reasonable accommodation. As indicated above, in this regard, the Court must look to the job description and must give considerable deference to the employer's judgment regarding the essential functions of the assembly job D'Eredita held. The job description calls for being able to read and interpret the Bill of Material as well as being able to recognize part numbers, which, in some cases described in the factual materials, vary by only a digit. Further, ITT has shown through its evidentiary proof in admissible form that accuracy with speed was essential, and that D'Eredita was unable to perform the essential functions of the Commercial Assembler job without an accommodation.

However, D'Eredita argues that, since the job description for his Commercial As-sembler position and those he held successfully in the past were similar, it must be

---

[2]This is the heading from the first point of D'Eredita's memorandum of law. It may be that he intended to argue in this point that he could perform the essential functions of his job *without* a reasonable accommodation, but that is not what he wrote. *Cf.* Pl.'s Mem. of Law, at 5, *with* Pl.'s Mem. of Law, at 7 ("Therefore, Plaintiff could perform the essential functions of his job."). As previously noted, Plaintiff's counsel's lack of attention to detail is glaring.

[3]D'Eredita uses the singular, "accommodation," in Point II of his memorandum, but the plural, "accommodations," in Point III.

something else, other than the requirements of the job itself, that was causing him to fail. (Pl.'s Mem. of Law, at 6.) His speculation, though, is not supported by the evidence. D'Eredita does not successfully raise an issue of fact with regard to what ITT considered an essential job function—being able to quickly read and comprehend instructions and numbers for properly assembling pumps.

D'Eredita also argues that he was treated differently from other assemblers who committed errors. (Pl.'s Appendix to his Local 56.1 Statement of Material Facts, Exs. SS & TT.) However, as ITT points out in its reply memorandum, D'Eredita has made no attempt to show that he was similarly situated in all material respects to the individuals with whom he seeks to compare himself. *Graham v. Long Island R.R.*, 230 F.3d 34 (2d Cir. 1999). As the Court noted in *Graham*:

> What constitutes "all material respects"…varies somewhat from case to case and, as we recognized in *Norville* [*v. Staten Island Univ. Hosp.*, 196 F.3d 89 (2d Cir. 1999)], must be judged based on (1) whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness. See 196 F.3d at 96. In other words, there should be an "objectively identifiable basis for comparability." *Cherry v. American Tel. & Tel. Co.*, 47 F.3d 225, 229 (7th Cir.1995).

*Graham*, 230 F.3d at 39. Here, D'Eredita has merely submitted the evidence that other employees were noted to have made errors in fabrication of pumps, but has not shown how those employees compare to himself. For example, the evidence shows that D'Eredita consistently made errors in fabrication, which Brown noted occurred on: February 28, 2003; March 17, 2003; March 18, 2003; June 27, 2003; July 24, 2003; November 6, 2003; November 14, 2003; and February 12, 2004. The errors consisted of packing a pump without a motor while on assembly line seven with two other assemblers; putting the

wrong unit into a box (three times); installing the wrong rubber channel into ten pumps; packing two pumps incorrectly; assembling ten pumps using the wrong motor; sending two pumps to a customer with the wrong motors; and incorrectly installing seals in a pump. He received counseling, or was involved in suspension hearings, a total of fifteen times over a period of about a year, from February 28, 2003 through February 20, 2004. (D. Brown Reply Decl. ¶ 13.)

By comparison, in notes submitted by D'Eredita concerning other employees, Tom Barnard ("Barnard") was called to the office by Brown and Brown "reflected on Tom's checkered past on quality issues." ((Pl.s Appendix to his Local 56.1 Statement of Material Facts, Ex. TT, at ITT001213.) Since Barnard had brought the error forward, Brown decided not to issue any type of discipline, but warned Barnard that "this will not be accepted behavior and that [Brown] will not continue to accept self referrals" without discipline. (*Id.*) The evidence, however, is insufficient to permit the Court to conclude that D'Eredita has raised an issue of fact with respect to how he was treated, vis-à-vis how the other employees who also committed errors. Consequently, the Court now turns to the question of whether D'Eredita has shown that he could perform the essential functions of the Commercial Assembler job with an accommodation.

**B**

Before reaching the issue of the reasonableness of D'Eredita's suggested accommodations, the Court must address his argument that ITT failed to engage in the interactive process required under the ADA. The Second Circuit, in *Jackan v. New York State Dept. of Labor*, 205 F.3d 562 (2000), held that, "The ADA envisions an 'interactive process' by which employers and employees work together to assess

whether an employee's disability can be reasonably accommodated." *Jackan*, 205 F.3d

at 566. In its decision in *Jackan*, the Second Circuit cited to the Seventh Circuit's

decision in *Beck v. University of Wisconsin Bd. of Regents*, 75 F.3d 1120 (7th Cir.

1996). There, the Seventh Circuit wrote the following:

> The employer has at least some responsibility in determining the
> necessary accommodation. The federal regulations implementing the
> ADA state:
>
> > To determine the appropriate reasonable accommodation it
> > may be necessary for the [employer] to initiate an informal,
> > interactive process with the qualified individual with a
> > disability in need of the accommodation. This process
> > should identify the precise limitations resulting from the
> > disability and potential reasonable accommodations that
> > could overcome those limitations.
>
> 29 C.F.R. § 1630.2(o)(3) (1995). But the regulations envision an inter-
> active process that requires participation by both parties:
>
> > [T]he employer must make a reasonable effort to determine
> > the appropriate accommodation. The appropriate
> > reasonable accommodation is best determined through a
> > flexible, interactive process that involves both the employer
> > and the [employee] with a disability.
>
> 29 C.F.R. pt. 1630, app.; *see also Grenier v. Cyanamid Plastics, Inc.*, 70
> F.3d 667, 677 (1st Cir.1995).

*Beck*, 75 F.3d at 1135. D'Eredita contends that ITT failed to engage in the interactive

process since it laid him off from work. (Pl.'s Mem. of Law, at 10.) ITT counters that it

turned a discharge into a layoff, and further, gave D'Eredita the option of bidding for non-

assembly jobs during the layoff period. Considering the information provided by D'Eredita

about what his limitations were, the Court concludes that ITT has shown that its proposed

accommodation, layoff, as opposed to discharge, with the option to bid on a non-assembly

job, was reasonable and that D'Eredita has not raised a material issue of fact on this

point. In that regard, both of D'Eredita's doctors suggested that he be moved to another job that did not involve anything but hands-on work. Moreover, while laid off, ITT continued D'Eredita's medical coverage, paying for the employer portion of the premium, a benefit not required under the labor contract. ITT also arranged and paid for a psychological evaluation to confirm Dr. Ryan's suspicions that D'Eredita suffered from dyslexia. Furthermore, ITT has shown that the layoff was justified as a disciplinary measure after almost a year of counseling and short suspensions. Especially resonant is the evidence that the day following his return to work from a disciplinary suspension in August 2003, D'Eredita built two pumps with the wrong motors, the motor part numbers differing by one digit. Therefore, the Court finds that D'Eredita has failed to raise a question of fact requiring a trial on the issue of whether ITT engaged in the interactive process to find a reasonable accommodation.

## C

ITT further maintains, that even assuming, *arguendo*, that D'Eredita could per-form the essential functions of his Commercial Assembler job with a reasonable accom-modation, his suggested accommodations were unreasonable. On this issue the Second Circuit has made it clear that, "[a] reasonable accommodation can never involve the elimination of an essential function of a job." *Shannon v. New York City Transit Authority*, 332 F.3d 95, 100 (2d Cir. 2003) (citing *Gilbert v. Frank*, 949 F.2d 637, 642 (2d Cir.1991)). Nonetheless, D'Eredita argues that the reading function of his assembler job, which ITT has designated as essential, could have been assigned to someone else, while he simply worked "hands on" on the line. (*See* Mark S. Ryan, M.D., letter to Stephen D'Eredita (Jun. 25, 2004), attached as Ex. RR to Pl.'s Appendix

to his Local 56.1 Statement of Material Facts, at 1.)[4] Giving requisite deference to ITT's job requirement for the position of Commercial Assembler, the Court concludes that D'Eredita's proposal to obviate the reading function was not reasonable.

Additionally, the Court finds that D'Eredita's suggestion that he be given another employee on his line was not reasonable, since it would have required reducing production standards. D'Eredita's line, line two, was already the lowest-producing line in the factory. Line two produced only 35% of the family of pumps produced in the factory, with line three handling about 65% of their production. Using four employees to produce the same number of pumps that could be produced by three would have required a loss in productivity in the factory, which the law does not require to accommodate a disabled employee. *Fink v. New York City Dept. of Personnel*, 53 F.3d 565, 567 (2d Cir. 1995).

At oral argument, D'Eredita's counsel suggested that Brown's chart showing production on the lines in the Commercial Factory support his position that D'Eredita could have been moved to a slower-paced line, such as line six, which he contends built larger pumps that required bedplating. Brown's declaration ¶ 19 shows that line six assembled ten to fifteen units per day with two assemblers, thus making each assembler responsible for building five to seven-and-a-half pumps per day, versus the twenty-five pumps built daily on line two by one assembler. However, Brown's declaration does not provide any evidence to support that D'Eredita's dyslexia would not have impeded

---

[4] Dr. Sorman's report, produced only during discovery in this litigation, indicates that D'Eredita could be accommodated by: "1. Restructuring [his] job requirements to hands-on work…" since he could not "accurately put numbers in a sequence on the computer unless he is given a much slower work pace and the numbers are checked." Dr. Sorman went on to state that, "It may be more appropriate to assign this task to someone else to have Mr. D'Eredita work on the line." For ITT to have accommodated D'Eredita by accepting Dr. Sorman's suggestions, would have resulted in "the elimination of an essential function of [his] job." *Shannon*, 332 F.3d at 100.

him from working on this line, and, in any event, Brown made it clear that ITT wanted Commercial Assemblers who would flexibly move from line to line as customer demands required. Accordingly, D'Eredita has again failed to raise a materia question of fact necessitating a trial on whether ITT should have tried him out on line six.

Considering the evidence[5] before the Court on this motion, the Court determines that D'Eredita has failed in his burden to raise a material issue of fact on the question of whether he could perform the essential functions of the Commercial Assembler position with a reasonable accommodation. Since D'Eredita has not met his burden of proving a *prima facie* case of discrimination under the ADA, that cause of action is dismissed.

### *Retaliation*

With regard to D'Eredita's retaliation claim, the Court agrees with ITT that "[e]ven assuming D'Eredita could establish a *prima facie* case of retaliation, he has failed to come forth with evidence to raise a[] material issue of fact concerning ITT's disciplinary actions." (Def.'s Reply Mem. of Law, at 9.) In his memorandum of law, D'Eredita contends that ITT's reason for laying him off was pretextual and the real reason was retaliatory discrimination. In this regard, he maintains that other employees who made similar mistakes were not laid off, and that during his suspension hearings, D'Eredita was not permitted "to call witnesses." (Pl.'s Mem. of Law, at 18.) As to the other employees, the Court has already discussed, in the context of the ADA claim, how D'Eredita failed to show that the other employees to whom he refers were similarly situated in all material respects.

---

[5] Also at oral argument, D'Eredita's counsel stated that his client has been reassigned by ITT to an assembly line, but provided no further details, and no evidentiary proof in admissible form to support his comment.

As to his inability to call witnesses, the evidentiary proof establishes that D'Eredita's request to call one witness, Todd Luisi, an ITT quality inspector, was denied. Regarding Luisi, the Court finds that D'Eredita has failed to offer any evidentiary proof in admissible form rebutting the non-discriminatory reason offered by ITT for denying his request. In this regard, D'Eredita's explanation for the leaking pump ("relaxed" seals), which was addressed in the February 20 suspension hearing at which he asked to call Luisi, was refuted by the objective testing conducted by Brown. More specifically, Brown conclusively disproved D'Eredita's "relaxed" seals theory by letting the properly-assembled pump rest for a week before retesting, at which time it was determined to be operating properly. Thus, there was no need to call Luisi concerning other pumps that were leaking because of defective welds.

Consequently, D'Eredita has not met his burden of showing that ITT's reason for disciplinary action was pretextual and that retaliatory discrimination was a motivating factor in its decisions.

## CONCLUSION

ITT's motion (Docket No. 16) for summary judgment is granted, and the case is dismissed. The Clerk is directed to enter judgment for ITT.

IT IS SO ORDERED.

Dated:  April 27, 2009
        Rochester, New York

ENTER:

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge